JOHN DOWNEY and Another v. CITY OF RED WING.[1]

May 16, 1913.

Nos. 17,826—(49).

**Intoxicating liquor — mayor's signature to license.**

1. Where the power to issue licenses to sell intoxicating liquors is vested in the city council, the function of the mayor under an ordinance requiring his signature to such licenses is purely ministerial, and he has no power in such connection to impose any conditions or limitations upon the use of the license.

**Delivery of license.**

2. Delivery of a liquor license to a third person to whom the licensee has sold his business, at the latter's request or upon his acquiescence, for the purpose of having it transferred to him, is sufficient to render the issuance of the license complete.

Action in the district court for Goodhue county to recover $500. The facts are stated in the opinion. The case was tried before Johnson, J., and a jury which returned a verdict in favor of plaintiffs. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Reversed with directions for the entry of judgment in favor of defendant

*Charles P. Hall,* for appellant.

*F. M. Wilson,* for respondents.

[1] Reported in 141 N. W. 495.

PHILIP E. BROWN, J.

Action in the nature of money had and received to recover $500 paid to the defendant for a license to sell intoxicating liquors in the city, which the plaintiff claims was not delivered. The defendant appealed from an order denying its motion for a new trial, after verdict for the plaintiff for the amount claimed. The material facts are practically undisputed, and are as follows, being stated most favorably to the plaintiff whenever there is any controversy in regard thereto:

On May 26, 1911, the city council granted the plaintiffs' application for license to sell intoxicating liquors at a specified place therein, from June 1, 1911, until June 1, 1912, and received $500 from them therefor. An ordinance of the city required, among other things, that the license should be signed by the mayor. Notwithstanding this, and on May 31, 1911, a license, regular in form, except that it did not contain the mayor's signature, was delivered to the plaintiffs, and they proceeded to sell liquor at the place stated therein, continuing so to do until June 7 thereafter, at which time they executed a bill of sale purporting to sell and transfer all their "title and right in and to all the property, license and privilege in and to the saloon and its business" to one Peter Thompson, who assumed control thereof.

Thereafter, on the same day, Sexton, one of the plaintiffs, and Thompson had an interview with the mayor in the presence of members of the licensing committee of the council, for the purpose of obtaining his signature to the license and of having an understanding that its transfer to Thompson would be approved by the city authorities. At this interview the mayor at first stated that he would not sign the license under any conditions, because the plaintiffs had been found guilty of violating the city ordinance in regard to selling liquor to minors; but after it was made clear to him by Sexton and Thompson that a sale of the saloon had been made to Thompson, conditioned upon the obtaining of the mayor's signature, he stated that he would do so if Sexton would make application to have it transferred to Thompson, and requested Thompson to procure the license from the saloon, and after this was done he laid it upon a table and affixed his signature thereto. Thompson then took possession of it, and immedi-

ately went, with Sexton, to the city clerk's office, where Sexton executed an instrument in the following form:

"Honorable City Council,—Gentlemen:

"We hereby make application to have our license No. 17, under which we are licensed to sell intoxicating liquors at No. 415 Third Street, transferred to Peter Thompson.

"Respectfully,

"Downey & Sexton,

"by Sexton."

This instrument was then filed in the office of the city clerk, and the license was taken to the saloon by Thompson and deposited in a drawer to which Sexton also had access. Thereafter the persons last mentioned opened the saloon and sold liquor, Sexton acting as barkeeper for Thompson, until the revocation of the license shortly to be mentioned. The council did not transfer the license to Thompson.

The complaint alleged, in effect, that the council, on June 14, 1911, illegally revoked the license for alleged "malfeasance, misfeasance and nonfeasance." The answer admitted the revocation but alleged that such action was legally taken. This phase of the case was not litigated, the court ruling correctly that it was immaterial.

The case was submitted to the jury on the theory that, if the license was not properly issued to the plaintiffs, then a recovery could be had, and in this connection the court charged, among other requirements not necessary here to state, that to constitute a valid issuance of the license it must have been signed by the mayor and delivered to the applicant without any conditions or qualifications, and further that, if either requirement mentioned were omitted, it would not be a license and would furnish no protection to the licensee. The court left it for the jury to say, as the sole question of fact to be determined, whether the license was delivered, and further stated, in elaboration of the proposition last above stated, that, "If the license was not in fact actually delivered to Downey & Sexton you will find that the license was not issued. If you find from the evidence that the mayor signed the license, not for the purpose of delivery to Downey & Sexton, but for the purpose of having the license transferred to Peter Thompson, then you will

find that this license was not issued. * * * It is the law that a license has no effect or validity until it has been delivered to the licensee, and if the license was not unconditionally, actually and physically delivered to the licensee or placed in their possession or under their control so that they might post it up in their saloon, there was no issuance of the license within the meaning of the law."

These instructions, we think, were equivalent to directing a verdict for the plaintiffs, for there was no evidence negativing the facts upon which the court predicated the plaintiffs' right to recovery. We cannot agree with the statements of the law expressed by the court as applied to the facts.

It is clear that the duties of the mayor in the premises were merely ministerial. He could have persisted in his refusal to sign the license, and in such event the plaintiffs, if dissatisfied, would have had the alternative of seeking a return of the deposit or of proceeding by mandamus to compel him to sign the license. They did neither, but by negotiations succeeded in obtaining his signature and a delivery for an ulterior purpose. The mayor, however, had no legal right to impose any conditions or limitations upon the use of the license, and all attempts on his part in this regard, no matter how laudable they may have appeared to him, were nugatory. He could neither add to nor subtract from its terms or import. True it is that a license becomes effective only upon delivery, but this does not mean that its validity depends upon its actually being placed in the hands of the licensee. Valid delivery may be made in other ways, one of which is by placing it in the possession of one designated by the licensee to receive it, which is clearly what was done here. How else could the intention of the plaintiffs to have a transfer made over to Thompson be executed? The purpose of the interview referred to was the accomplishment of this end, and Sexton testified that his understanding was that "the mayor agreed to sign this license in order to transfer over to Mr. Thompson." The fact that the plaintiffs knew that a delivery of the license had been made to Thompson at their request or at least upon their acquiescence, for the purpose of seeking a transfer to him, must be deemed to be conclusively established, and it is equally certain that if the license

had been conspicuously posted in the saloon after the mayor's signature was attached thereto, during the plaintiffs' ownership and before its revocation, it would have afforded protection in the prosecution of their business.

The fact that the plaintiffs had theretofore disposed of their saloon chattels is immaterial. The city was not concerned in this transaction so far as the issuance of the license was concerned. The decision in City of Jordan v. Bespalec, 86 Minn. 441, 90 N. W. 1052, is not inconsistent with our determination in the present case. It was there held that, under the city charter, the execution of the license by the mayor was a condition precedent to the right to vend liquors. The converse of the rule stated is equally true, namely, that where all other prerequisites have been complied with, his execution of the license confers the privilege.

Order reversed with directions for the entry of judgment for the defendant.